UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| LARRY DAVID REAVES, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:11-cv-0018 |
| v. ) | Judge Wiseman/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

To: The Honorable Thomas Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 18, 19, 23). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 15). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **GRANTED in part** and this action be **REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g), sentence four.

## I. INTRODUCTION

Plaintiff filed an application for DIB and SSI on December 4, 2006 with an alleged onset date of November 21, 2006. (Tr. 121-23, 126-29). Plaintiff's claims were denied initially and upon reconsideration. (Tr. 64-67, 76-79). A hearing was held on December 4, 2009 before

Administrative Law Judge ("ALJ") William Taylor. (Tr. 38-56). The ALJ denied Plaintiff's application in a decision dated December 16, 2009. (Tr. 15-32).

In his decision denying Plaintiff's claims, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.
2. The claimant has not engaged in substantial gainful activity since November 21, 2006, the alleged onset date (AOD) (20 CFR 404.1572 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: lumbar degenerative disc disease (DDD) with spondylosis; right knee degenerative joint disease (DJD), status post surgery; and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (RFC) to perform lifting and/or carrying of 50 pounds occasionally and 25 pounds frequently; standing and/or walking of 6 hours in an 8 hour workday; sitting of 6 hours in an 8 hour workday; can perform unskilled and low level semi-skilled work.
6. The claimant is capable of performing past relevant work.
7. The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 15-32).

The Appeals Council denied Plaintiff's request for review on January 28, 2011. (Tr. 1-5). This action was timely filed on March 29, 2011. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born in 1955 and has a third-grade education. (Tr. 42, 121). He is unable to read or write "more than a little." (Tr. 42).

Beginning in 2004, Plaintiff saw Dr. David Magas for primary care. (Tr. 189-215). Dr.

Magas's records also reflect an MRI of Plaintiff's lumbar spine that was taken on November 27, 2002. (Tr. 215). The MRI showed mild disc bulges at L-3/L-4 and L-4/L-5 with no evidence of disc herniation, canal stenosis or nerve root impingement. *Id*. On February 2, 2004, Dr. Magas performed a follow-up for Plaintiff's back pain and refilled his medication. (Tr. 213). He also treated Plaintiff for GERD. (Tr. 211). On September 27, 2004, Plaintiff told Dr. Magas he was not being treated at the pain clinic. (Tr. 208). Plaintiff was discharged from Dr. Magas's care due because he failed to complete a urine drug screen on May 2, 2006. (Tr. 442-43).

Plaintiff began treatment with Judy Jones, FNP, in May 2006. (Tr. 312-52, 634-72). She provided medication for his back pain and other ailments. *Id*.

On August 7, 2006, Plaintiff reported the prescribed medication was working well. (Tr. 328, 652). When Plaintiff reported worsened back pain on November 6, 2006, Ms. Jones attributed it to weather changes. (Tr. 325).

Plaintiff had an additional MRI of the lumbar spine on December 7, 2006. (Tr. 462). The MRI showed a small laminotomy defect on the right at L5-S1 and a very small central focal protrusion at L4-5 on a background of diffuse disc bulging at L4-5. *Id*. The radiologist observed that facet osteoarthropathy produced mild caudal neural foraminal narrowing bilaterally at L4-5, but no high grade central canal stenosis was present. *Id*.

On February 5, 2007, Plaintiff told Ms. Jones his lower back pain persists, but medication helps. (Tr. 321). On May 7, 2007, he reported worsened lower back and upper leg pain. (Tr. 318). At a follow-up appointment on June 7, 2007, Plaintiff complained of persistent worsened lower back pain and spasm, but his medications from Centerstone were helping with his psychological issues. (Tr. 317). Plaintiff had an appointment scheduled for pain management the next week. *Id*.

Plaintiff had an intake appointment at Centerstone on February 22, 2007. (Tr. 223-35). He complained of depression, in part due to family problems, including lack of child support. *Id*. His GAF[1] was measured at 48. (Tr. 233). Plaintiff had no positive response to Celexa. (Tr. 305). Through most of 2007, his GAF remained constant at 48, reaching as high as 50 on July 2, 2007. (Tr. 269-310). His counselor noted his stressors are pain, financial issues, and his family, including his ex-wife. *Id*. On July 25, 2007, his counselor noted Plaintiff's "major improvement in functioning due to a medication change." (Tr. 286).

On June 29, 2007, he was discharged from The Pain Center of Lawrenceburg due to illegal substance in his urine. (Tr. 348). At a follow-up appointment with Ms. Jones on July 3, 2007, she ordered a urine drug screen and informed Plaintiff that, if it was positive, he would be discharged from her care. (Tr. 316). In her notes, Ms. Jones reported Plaintiff took Sudafed and Didrex, which apparently may have resulted in a positive drug screen. (Tr. 640). Plaintiff continued in Ms. Jones's care until at least December 6, 2007. (Tr. 634-72).

Plaintiff saw Douglas Wilburn, MD, for knee pain from October 1, 2007 through November 25, 2008. (Tr. 487-99). An MRI of his right knee dated October 9, 2007 showed a complex right medial meniscus tear and moderate intrasubstance tearing of the lateral meniscus. (Tr. 496). Plaintiff underwent arthroscopic surgery for right medial meniscus tear on October 31,

---

[1] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

2007. (Tr. 353-54). On November 25, 2008, Dr. Wilburn noted Plaintiff had joint pain and difficulty walking. (Tr. 487). He opined Plaintiff still has a 1+ effusion in the right knee and limps on the knee. *Id*.

Ms. Jones completed a report dated December 20, 2007, as well as a Multiple Impairment Questionnaire. (Tr. 413-58). Ms. Jones noted she does not do exams for disability, but she opined Plaintiff would not be able to work full time at any job. (Tr. 414-15, 423). In the Multiple Impairment Questionnaire, Ms. Jones stated she had diagnosed Plaintiff with: hypertension, peripheral edema, GERD, osteoarthritis bilateral knees and ankles, history of herniated disc lumbar spine with surgical repair and subsequent "failed back symdrome" with constant lower back pain,[2] panic attacks, hyperlipidermia, hyperglycemia, obesity, and fatigue. (Tr. 450). She believed he has a severely poor prognosis. (Tr. 450). Ms. Jones stated Plaintiff has constant lower back pain at a level of 8-10 on a 10-point scale. (Tr. 452-53).

Ms. Jones provided a Residual Functional Capacity ("RFC") assessment for Plaintiff. (Tr. 453-57). She believed he could sit for 0-1 hours, and would need to move every 15 minutes. (Tr. 453). He could occasionally lift and/or carry up to 10 pounds, with marked limitations in grasping, turning, and twisting objects. (Tr. 454-55). He also has moderate limitation in using his fingers and hands for fine manipulation and in using his arms for reaching. *Id*. He is incapable of even low stress, and he is likely to be absent more than 3 times per month. (Tr. 456-57).

On December 12, 2007, Plaintiff's counselor at Centerstone noted Plaintiff "seems more at ease" and "seems a little more carefree." (Tr. 387). At a February 18, 2008 appointment,

---

[2] Plaintiff provided a verbal medical history to some of his health care providers that indicated he had an accident in approximately 1992 and had back surgery shortly thereafter.

5

Plaintiff reported his son helps him with household chores ,and he can only walk 15 minutes at a time. (Tr. 545). His counselor noted on March 5, 2008 that "Larry has been a little improved in his depression and a little more optimistic but no major robust response." (Tr. 539). On May 28, 2008, his GAF was measured at 47, and his counselor stated that "Larry has had no major + [SIC] response from his regiment [SIC] which is partly due to his health, financial, and parenting stressors." (Tr. 527, 29).

Plaintiff began seeing Esmeraldo Herrera, MD, on June 9, 2008. (Tr. 464-85). He described his pain as a 7 without medication and a 3 to 4 with medication. (Tr. 480-81). On June 17, 2008, he described his pain as an 8 without medication and a 6 after taking his medication. (Tr. 477-78). ON August 15, 2008, he noted his pain was an 8-9 prior to medication and a 3-4 after, due to a medication change. (Tr. 469-71). However, Plaintiff stated he was unable to sit, stand, or walk due to pain, and his only relief came from laying down. *Id*. He described difficulties staying involved in his 10-year-old son's life due to pain. *Id*. He also requested erectile dysfunction medication. *Id*.

Plaintiff had a CRG assessment at Centerstone dated July 7, 2008. (Tr. 581-82). His GAF was measured at 47, and he had moderate restrictions in activities of daily living, interpersonal functioning, and adaptation to change. *Id*. He had mild restrictions in concentration, task performance, and pace. *Id*.

On June 16, 2008, Plaintiff reported that his psychological medication was helping some, but he was concerned it was causing some weight gain. (Tr. 524-25). On July 21, 2008, his GAF was measured at 52. (Tr. 521). At an August 20, 2008 appointment, his counselor noted Xanax and lithium have decreased Plaintiff's depressed mood and worry to some extent. (Tr. 514).

6

Plaintiff had an MRI of the lumbar spine on September 2, 2008. (Tr. 459-61). The MRI showed mild to moderate lumbar spondylosis, with no evidence of fracture or focal nerve root entrapment. *Id*. There was mild to moderate disc bulging and osteophyte formation with mild bilateral facet arthrosis at L3-4 and L4-5. *Id*.

At a February 11, 2009 appointment at Centerstone, Plaintiff's counselor noted, "Larry is seemingly doing better since addition of the lithium. Has been feeling more in control of his feelings." (Tr. 612). On February 20, 2009, Plaintiff sought treatment at Centerstone and displayed manic speech. (Tr. 611).

Plaintiff's weight ranged from 260 pounds in July 2005 to 250 pounds in March 2007 and 298 pounds in June 2008. (Tr. 195, 257, 480). Plaintiff is approximately five feet, eight inches tall. (Tr. 480).

J. Michael Graves, MD, completed a Psychiatric/Psychological Impairment Questionnaire on Plaintiff's behalf dated August 7, 2009. (Tr. 625-32). He estimated Plaintiff's GAF at 48, with a low of 45 in the past year. He noted Plaintiff's pain causes depression symptoms. Plaintiff has marked limitations in ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; and ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 628-30). Plaintiff has moderate limitations in the ability to remember and understand detailed instructions; the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance; the ability to interact appropriately with the general public; the ability to accept instructions and respond

7

appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to travel to unfamiliar places or use public transportation. *Id*. Dr. Graves believed he was likely to be absent more than three times per month.

Melissa Greer, M.S., L.P.E., performed a consultative psychiatric examination on Plaintiff dated February 20, 2007. (Tr. 217-21). She noted Plaintiff is able to care for his 9-year-old son. He goes to bed at 9 and gets up between 4:30 and 5. He bathes and dresses himself, has visitors, and mows the lawn with a riding mower. His brother and sister help with laundry, housekeeping, and grocery shopping. He prepares meals in the microwave and is able to drive. He "can't be around people as much as [he] used to." (Tr. 219). Ms. Greer estimated Plaintiff's intelligence in the low average range and noted he has mild anxiety. *Id*. She believes he is moderately limited in the ability to understand and remember and in the ability to sustain concentration and persistence and adaptation due to impairment of short-term memory and somewhat lowered concentration. (Tr. 220). She noted he was not significantly limited in social interaction. *Id*. She estimated his GAF to be 55-60. (Tr. 221).

Plaintiff had a consultative exam with M.C. Woodfin, M.D., on March 21, 2007. (Tr. 255-59). Plaintiff denied ever using street drugs. Dr. Woodfin noted Plaintiff sat for 20 minutes without getting up or moving around. (Tr. 257). He stated Plaintiff "does not act like someone with low back pain as he moves about the room. He has an erect gait without limp, spasticity or ataxia. Specifically, no assistive device for ambulation was brought." (Tr. 257). Dr. Woodfin noted Plaintiff had a full range of motion in the shoulders and upper extremities. (Tr. 258). In his spine, Plaintiff had 60 degrees flexion, 15 degrees extension, 30 degrees tilt, turn, right or left without voiced or apparent discomfort. *Id*. His spine was straight without deformity, tenderness,

or spasm, but there was some curvature in the lower lumbar area going to the left. *Id*.

James B. Millis, M.D., provided a consultative RFC Assessment dated April 18, 2007, based in part on Dr. Woodfin's exam. (Tr. 260-67). He opined Plaintiff could occasionally lift and/or carry up to 50 pounds and could frequently lift and/or carry 25 pounds. Plaintiff could stand and/or walk about 6 hours and sit about 6 hours in an 8-hour workday. He was unlimited in push/pull, with no postural, manipulative, visual, communicative, or environmental limitations. Dr. Millis believed Plaintiff's alleged physical impairments were not fully credible, and there were no medical records of significant arthritis. *Id*. Frank R. Pennington, M.D., provided an identical RFC assessment dated November 21, 2007. (Tr. 356-62).

Fawz E. Schoup, Ph.D., provided a consultative mental RFC for Plaintiff dated March 2, 2007. (Tr. 250-53). He believed Plaintiff was moderately limited in the abilities to understand and remember detailed instruction; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. *Id*. Plaintiff can understand and remember simple and low level detailed tasks, he can concentrate on and persist for simple and low level detailed tasks, despite some difficulty, and he can adapt to infrequent change. *Id*. William M. Regan provided a similar mental RFC dated December 13, 2007. (Tr. 377-79).

At the hearing, Plaintiff testified that he has a third-grade education[3] and was self-employed doing light carpentry work, installing vinyl siding, and underpinning mobile homes for

---

[3] There are several references in the record that indicate Plaintiff has a fifth grade education.

9

approximately 8 years until he could no longer work in November 2006. (Tr. 42, 44). He drives daily. (Tr. 42). Plaintiff is a smoker who smokes approximately one-half pack of cigarettes per day. (Tr. 43). He used marijuana approximately twelve years ago. *Id*.

Plaintiff testified that he can sit for approximately 20-30 minutes and can stand for approximately 15-20 minutes without changing position. (Tr. 47). He can walk about a block, but if he goes further, he has severe pain and his legs start to lock up. *Id*. His legs started locking up after he had knee surgery in 2007. (Tr. 47-48). He can lift 5-6 pounds. (Tr. 53). Plaintiff walked to the hearing using a cane that was recommended by his counselor at Centerstone. *Id*.

Plaintiff testified that he had a positive urine drug screen at the pain center in Lawrenceburg in 2007. (Tr. 49). He stated he was taking a drug prescribed by Dr. Herrera that must have caused the positive result. *Id*. Plaintiff recalled a urine drug screen administered by Judy Jones's office after he was discharged from the pain center, but he did not recall a drug screen order in 2006. (Tr. 50-51). He claimed he was never discharged from Jones's practice. *Id*.

Plaintiff sees a mental health counselor at Centerstone monthly. (Tr. 52). His psychiatric medications make him feel better. (Tr. 53). He stated that he does not feel as depressed and he can "kind of communicate with people a little bit better." *Id*.

Vocational Expert ("VE") Gordon Doss testified that Plaintiff had past relevant work as a production supervisor (light, skilled), a caretaker/odd-job worker (light unskilled), and as a carpenter/construction worker (medium, skilled). (Tr. 45-46). The ALJ proposed a hypothetical individual Plaintiff's age with Plaintiff's educational background and work experience who could perform a full range of medium work and who could perform in unskilled and low-level semi-skilled positions up to an SVP of three. (Tr. 54). The VE testified that the hypothetical individual

could perform all of Plaintiff's past work. *Id*.

Plaintiff's attorney asked whether the hypothetical individual could perform Plaintiff's past work if he had to take excessive breaks during the day to sit, stand, or recline or if he would be absent more than two to three times per month. (Tr. 54-55). The VE testified that excessive breaks were not usually allowed, and employers allow approximately three and a half to four days a month as the average sum total of hours for sick leave, vacation time, and personal holidays. *Id*.

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

In his Motion, Plaintiff alleges four errors. First, the ALJ failed to properly evaluate the medical opinion evidence, particularly Ms. Jones's treating records. Second, the ALJ failed to consider Plaintiff's obesity. Third, the ALJ failed to properly evaluate Plaintiff's credibility. Fourth, the ALJ's hypothetical to the Vocational Expert was not supported by substantial evidence. As the Magistrate Judge believes remand is appropriate to reconsider the medical opinion evidence, only the first error has been examined.

A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

11

(*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.  Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or

---

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

>    her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> 5.  Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*; *see also Moon*, 923 F.2d at 1181. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through VE testimony. *See Wright*, 321 F.3d at *616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

C.  <u>The ALJ Failed to Properly Evaluate Medical Source Opinions</u>

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of

13

time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). In the case of a nurse practitioner, who is not an "acceptable medical source" within the meaning of 20 CFR §§ 404.1527(d)(2) and 416.927(d)(2), the ALJ need not give the opinion controlling weight. Moreover, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency with the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). Additionally, it should be noted that a treating physician's statement that the claimant is "disabled" does not bind an ALJ as the definition of disability requires consideration of both medical and vocational factors. 20 C.F.R. § 404.1527(e)(1); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Here, the ALJ rejected the opinions of Ms. Jones and Dr. Graves, both treating sources. (Tr. 22-31). In discounting Ms. Jones's opinion, the ALJ gave great weight to Plaintiff's activities of daily living, which he believed were inconsistent with Ms. Jones's opinion that Plaintiff could sit for less than 1 hour in an 8-hour workday and could stand less than 1 hour in an 8-hour workday. The ALJ characterized this opinion as an "RFC for the bedridden and consistent with a

14

nursing home occupant's abilities." (Tr. 29-30). While this aspect of the RFC does appear to be inconsistent with Plaintiff's ability to drive, mow the lawn, and care for his minor son, Ms. Jones's lifting restrictions, limited to 10 pounds, have more support in the record.

Dr. Woodfin, the state's own consultant, examined Plaintiff and noted his belief that Plaintiff may need to avoid frequent bending and/or heavy lifting. (Tr. 259). Dr. Woodfin believed Plaintiff's back might be fine if he avoided frequent bending and heavy lifting, but he cautioned "this may be worse than that. *Id*. Nevertheless, the ALJ instead adopted two consulting, non-examining physicians' opinions that were issued only a few months apart and used almost entirely the same medical records. (Tr. 260-67, 356-62). The ALJ claimed that Dr. Woodfin's examination findings do not support these restrictions, but Dr. Woodfin apparently observed enough discomfort to recommend Plaintiff not lift heavy things and avoid frequent bending.

The Magistrate Judge is also concerned by a repeated mistake made by the ALJ. The ALJ was apparently under the impression that Plaintiff was discharged from Ms. Jones's care twice. However, Plaintiff was in fact discharged from The Pain Center (after a urine drug screen positive for an illegal substance) and from Dr. Magas's practice (after failing to comply with an order for a urine drug screen).[5] It appears that Ms. Jones never discharged Plaintiff from her practice, although Plaintiff had a positive urine drug screen while under her care.[6] It is unclear how much

---

[5] On May 2, 2006, Plaintiff had an appointment with Dr. Magas to refill his prescriptions. (Tr. 442-43). Dr. Magas apparently ordered a routine urine drug screen. (Tr. 443). The incomplete handwritten notes at the top of the page suggest Plaintiff drank two glasses of water and then asked to leave to get a cup of coffee but instead left the office without telling anyone and called later that day and claimed he had an emergency and had to leave. (Tr. 443). The notes indicate Plaintiff was discharged. *Id*.

[6] The ALJ is also misleading in his presentation of these facts. He notes Plaintiff requested Xanax in April, 2007. Immediately after describing this interaction, the ALJ states, "Then, on May 2, *2006*, at the office of FNP Jones, he had two glasses of water

15

being discharged twice from Ms. Jones's practice, when Plaintiff was not in fact discharged from her practice at all, impacted the ALJ's decision. The ALJ references it a number of times in determining Plaintiff's credibility, and therefore the Magistrate Judge is unable to determine that the ALJ had substantial evidence for his decision.

With regard to Dr. Graves's opinion, the ALJ rejected his GAF scores as inconsistent with those found at Centerstone. (Tr. 30-31). This is clearly inaccurate. The Centerstone records show an almost constant GAF score of 47 or 48, with a high score of 52 on July 21, 2008. (Tr. 269-310, 501-624). Dr. Graves's assessment of Plaintiff's GAF at 48 is clearly consistent with the Centerstone records. (Tr. 625-32). While medications seem to have helped Plaintiff's depression, his counselors have been, at best, cautiously optimistic regarding their effect, using phrases such as "seemingly doing better" and "a little improved." (Tr. 539, 612). The ALJ also noted that Dr. Graves's opinion regarding Plaintiff's chronic pain complaints "would be credible if a preponderance of the evidence demonstrated he had disabling pain." (Tr. 30). Because the Magistrate Judge does not believe the ALJ had substantial evidence for completely discounting Plaintiff's complaints of chronic pain, this must be reexamined on remand.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **GRANTED in part** and this action be **REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g), sentence four.

Any party has fourteen (14) days from receipt of this Report and Recommendation in

---

for urine drug screen (UDS), then asked to leave to get a cup of coffee; however, he left the office and never returned." (Tr. 22) (emphasis added). Not only is the factual scenario incorrect, as Plaintiff was discharged from Dr. Magas's practice, the presentation suggests the May 2006 event occurred after the April 2007 event.

16

which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 19th day of March, 2012.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge